UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                                       :
RAYMOND CARTON                                         :        3:13 CV 379 (JGM)
                                                       :
V.                                                     :
                                                       :
CAROLYN W. COLVIN,                                     :
ACTING COMMISSIONER OF                                 :
SOCIAL SECURITY                                        :
                                                       :        DATE:   DECEMBER 9, 2013
-------------------------------------------------------x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF
THE COMMISSIONER AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER

This action, filed under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§

405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff disability insurance benefits ["DIB"] and Supplemental Security

Income ["SSI"] benefits.

I.  ADMINISTRATIVE PROCEEDINGS

On October 27, 2010, plaintiff Raymond Carton, applied for DIB and SSI benefits claiming

that he has been disabled since January 1, 2010,[1] due to mental disorders and emotional problems.

(Certified Transcript of Administrative Proceedings, dated May 6, 2013 ["Tr."] 30, 179-88; see Tr.

74, 213). The Commissioner denied plaintiff's application initially and upon reconsideration.  (Tr.

120-27, 129-34; see Tr. 96-97, 118-19, 128).   On May 16, 2011, plaintiff filed a request for a

hearing before an Administrative Law Judge ["ALJ"].  (Tr. 138; see Tr. 139-47). Plaintiff was, and

continues to be represented by counsel. (Tr. 135-37, 450).  On March 13, 2012, a hearing was held

---

[1]At his hearing before the ALJ, plaintiff amended his onset date from 2005 to January 2010.  (See
Tr. 30, 32; see also Tr. 74 (original onset date of August 21, 2005)).

The ALJ proceeded to note that she was "all confused with this onset. 2010, yeah."  (Tr. 37).

before ALJ Amita B. Tracy at which plaintiff, plaintiff's mother, Patricia Carton, and a vocational expert, Albert J. Sabella, testified. (Tr. 26-73; see Tr. 148-64, 171-78).  On March 27, 2012, ALJ Tracy issued an unfavorable decision denying plaintiff benefits.  (Tr. 8-25).   On February 1, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3; see Tr. 7).

On March 20, 2013, plaintiff filed his complaint in this pending action  (Dkt. #1),[2] and on May 28, 2013, defendant filed her answer, along with a copy of the Certified Administrative Transcript, dated May 6, 2013.  (Dkt. #6).  On June 28, 2013, plaintiff filed his Motion to Reverse the Decision of the Commissioner, with exhibits in support (Dkt. #11),[3] along with the filing of an additional exhibit that same day.  (Dkt. #12).[4]  On August 14, 2013, defendant filed her Motion to Affirm, with brief and exhibit in support.[5]  (Dkt. #13).

Accordingly, for the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #11) is granted such that the case is remanded for further proceedings consistent with this Recommended Ruling, and defendant's Motion to Affirm (Dkt. #13) is denied.

---

[2]Along with his Complaint, plaintiff filed a Motion to Proceed In Forma Pauperis (Dkt. #2), which motion was granted the same day.  (Dkt. #3).

[3]Attached to plaintiff's brief are the following exhibits: copies of case law; copy of Memorandum from the Social Security Administration, dated May 11, 1998; and copy of SSR 96-4p.

[4]Plaintiff's Motion to Amend/Correct (filing of additional exhibit to Memorandum in Support of Motion to Reverse)(Dkt. #12) is granted.

Attached to this motion is a copy of Gayheart v. Comm'r of Soc. Sec., No. 12-3553 (6th Cir. March 12, 2013).

[5]Attached to defendant's brief is a copy of Occupational Requirements for "Cleaner, Housekeeping" and for "Assembler."

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING AND EMPLOYMENT HISTORY

Plaintiff was born in 1961; he is fifty-two years old. (Tr. 32, 210, 240, 258). Plaintiff is single and does not have any children.  (Tr. 32-33). At the time of his hearing, plaintiff was living alone in a condominium.  (Tr. 33).  He has a bachelor's degree and has certificates for completing the police academy.  (Tr. 33-34).

On a typical day, plaintiff's mother comes over in the morning for breakfast, plaintiff will go to his doctor's appointments, he will do " a little reading[,]" he makes phone calls, and he uses the computer.  (Tr. 44). His mother lives about two blocks away and she supports him financially. (Tr. 33, 52).  According to plaintiff, his mother "does everything[]" for him, including making his meals (Tr. 53; see Tr. 254), and he has needed her to assist him with every day functions since "between 2004 and 2006."  (Tr. 60).   However, plaintiff also reported that he is capable of making sandwiches and "light cooking[,]" although now he only eats once or twice a day. (Tr. 230).  He sees his mother "at least twice if not two or three, three or four times a day."  (Tr. 53; see also Tr. 60 (plaintiff's mother testified that she sees him "several times a day every day.")).  His mother often gives him instructions for things to do during the day, but he "screw[s] up."  (Tr. 53). According to his mother, plaintiff "cannot attend to tasks for any period of time.  He just, after a short period of time, he just loses it." (Tr. 60).  Additionally, plaintiff's mother opined that plaintiff could not function in a group and follow directions.  (Tr. 61).  Plaintiff's mother's dog lives with him. (Tr. 46).  His mother testified that plaintiff "absolutely [could] not" function on his own, as he needs reminders to eat, and he needs her help to open and pay bills.  (Tr. 60-63).

According to plaintiff, he bathes once a week (Tr. 229), and he empties the garbage, "sometimes" does the laundry, and helps his mother shovel the snow.  (Tr. 231).   Plaintiff drives

3

approximately three times a week, to doctors' appointments and shopping. (Tr. 33, 54, 231). Plaintiff has "like an obsession[]" with flashlights. (Tr. 44-45; see Tr. 228). He has been collecting them since May 2010, then "the new LED technology[]" started, which "[piqued] [plaintiff's] curiosity." (Tr. 45). He has about seventy-five flashlights. (Id.).

According to plaintiff, he has trouble understanding information or instructions, and he gets "frustrated and upset[]" when he has to follow steps, and he is a "recluse[, he does not] get along pretty much with anybody." (Tr. 44). Plaintiff does not socialize or go out (Tr. 44; see Tr. 56, 233), and he only sees his two sisters, brothers-in-law, and nieces and nephews once a year at Christmas. (Tr. 51-52). According to plaintiff, he "[d]istrust[s]" people. (Tr. 55). He reported that he has problems with his memory, completing tasks, getting along with others, understanding, following instructions, and concentrating. (Tr. 233). He explained that his "mind races . . . tak[ing] off like a million things going on." (Tr. 43; see also Tr. 45). Additionally, he described himself as "jumpy," and that he likes "instant gratification." (Tr. 48).

Plaintiff reported taking Bupropion XL/Wellbutrin and Seroquel. (Tr. 230, 354, 406, 417, 419). Plaintiff also takes Bystolic which has his high blood pressure controlled. (Tr. 40-41, 322). The medical records also reveal that plaintiff takes or has taken Lithium, Celebrex, Abilify, Vyvanse and Adderall. (Tr. 322, 398, 466, 468). According to plaintiff, his medications make him "lethargic, tired all the time[,]" and his skin gets dry, but "they help [his] mind not racing [sic] sometimes." (Tr. 38-39). In his words, his medications "help [him] muddle through the day[.]" (Tr. 39). Plaintiff testified that "[t]he medication[s] . . . help out[,]" but he is "depressed[,]" and he "just want[s] to get back to who [he] was." (Tr. 42). Plaintiff's mother reminds him to take his medications, and to go to therapy. (Tr. 41, 43, 229).[6]

---

[6]Plaintiff testified that he last used alcohol in December 2009 after he underwent detoxification at St. Vincent's Hospital. (Tr. 42; see also Tr. 49). He has had two in-patient hospitalizations for

Plaintiff testified that he last worked in about 2005; he stopped working because his "services were no longer needed." (Tr. 34). At that time, he was working part-time, cleaning and washing boats; he stopped working when the season ended. (Tr. 34-35; see generally Tr. 214). Prior to that, plaintiff worked as a criminal investigator until he was removed from that position in 2003 for "[i]nattention to duty, conduct unbecoming an officer, [and] a problem with a travel authorization form." (Tr. 35; see generally Tr. 214, 220-22).[7] In his job as a criminal investigator, plaintiff investigated "title fraud [and] Title XVIII violations, both criminally and civilly[,]" most recently for the Department of Homeland Security,[8] and prior to that for Health and Human Services. (Tr. 35-36). According to plaintiff, he had supervising "problems[,]" was "not able to follow instructions[,]" and he does not handle stress well. (Tr. 234). When he was working, plaintiff traveled often, taking many vacations, to the West Coast, to Austria to ski, and to Whistler, British Columbia. (Tr. 54-55).

When he stopped working full-time in 2005, plaintiff helped care for his grandmother, making "sure she didn't fall"; his "expenses were covered[]" by his family. (Tr. 37). As of November 8, 2010, plaintiff reported that he would feed his grandmother and take her to her doctor's appointments. (Tr. 228).[9] When asked if he has looked for jobs, plaintiff testified that he

---

detoxification. (Tr. 48-49).

[7]According to plaintiff, after that he filed an EEOC complaint and then his office "basically built a case against me and . . . they suspended [him] for a long time and then [he] received the notice [that he] was terminated." (Tr. 35-36).

Prior to working as a criminal investigator, plaintiff worked as a park ranger patrolling parks in Boston. (Tr. 223).

[8]Plaintiff testified that when he worked as a criminal investigator, he worked for the arm of the Department of Justice, formerly known as Immigration and Naturalization Service. (Tr. 35-37; see also Tr. 220).

[9]Plaintiff also reported that his grandmother also received care from a home health care agency that would come to their home. (Tr. 229).

"just can't get it together." (Tr. 46). Several years ago, he looked for work in the law enforcement/security field, but he found that he is "not . . . tech savvy, up to date on technology." (Tr. 47). He feels that he is prevented from working because his medication makes him "lethargic, run down . . . [and] onery[,]" such that he does not "get along with others." (Id.).

At plaintiff's hearing before the ALJ, Sabella, the vocational expert testified that an individual of plaintiff's age, past work experience, limited to work at all exertional levels except that the individual is limited to simple, routine, repetitive tasks, involving simple, work-related decisions and occasional interaction with the public, would be able to perform plaintiff's past work as a dock hand. (Tr. 66-67). The ALJ then asked the vocational expert if there is any other work that an individual could perform, with "medium[,] . . . light [or] sedentary" exertion, "it doesn't matter." (Tr. 67). The vocational expert testified that at a medium exertional level, such an individual could perform the work of a hand packager or warehouse worker; at the light exertional level, that person could perform assembly and cleaning work; and at the sedentary exertional level, that person could also perform assembly work, and could perform inspection work such as that found in the electronic industry. (Tr. 67-68). When the ALJ added to the hypothetical that such an individual would have limited to no interaction with the public, he could not perform any past work as a dock hand, but could perform that other jobs discussed above. (Tr. 69). Additionally, Sabella acknowledged that if the individual would be "off task [twenty] percent of the time due to concentration problems[,]" that person would be precluded from employment. (Tr. 69-70). Similarly, a person absent more than three times a month would also be precluded from employment (Tr. 70), as would a person who would be off task, and need a rest period for ten or fifteen minutes every hour. (Tr. 70-71).

---

Plaintiff's grandmother passed away in late September 2011. (Tr. 471).

B. PLAINTIFF'S MEDICAL HISTORY

There are several records predating plaintiff's January 2010 amended onset date of disability; the Court will focus its attention on those relevant documents from 2010 forward.[10] Accordingly, plaintiff's relevant medical records begin on January 13, 2010 when plaintiff returned to Stratford Community Health Center with complaints of left leg pain when walking. (Tr. 329, 364).[11]  A month later, on February 3 and 17, 2010, plaintiff continued to complain of left leg pain. (Tr. 363).   Plaintiff was seen at the Post Traumatic Stress Clinic in New Haven[12] in February and March 2010, for his anxiety and history of traumatic experiences from upbringing, his sister's lost battle with drugs, and experiences working on the Mexico border.  (Tr. 393).  In April 2010, it was noted that plaintiff "appears to have developed various ticks in speech [and] movement." (Tr. 394).

---

[10]The Court notes that there are records from plaintiff's October to December 2004 in-patient detoxification from alcohol and OxyContin at the Stonington Institute (Tr. 289-91; see also Tr. 292-303). In June 2008 and in February and October 2009, plaintiff was seen at the Bridgeport Community Health Center regarding pain in his right knee.  (Tr. 336-37, 372).  In February 2009, plaintiff underwent an x-ray of his left knee which results were "[n]ormal."  (Tr. 353, 388).

Plaintiff was seen in May 2008 at the Stratford Community Health Center, at which time he admitted that he had been "drinking vodka[.]" (Tr. 339-40).  Plaintiff returned in April, June, July and September, 2009. (Tr. 331-35, 365-66, 371). Plaintiff was also seen at the Bridgeport Community Health Center in May and June 2008 and June and July 2009. (Tr. 367, 369, 373, 375-76).

On February 9, 2009, plaintiff was seen at the Post Traumatic Stress Center in New Haven.  (Tr. 391-92).  Plaintiff presented anxious, with a depressed mood, and with increased irritability. (Tr. 391). He had a history of physical abuse by his father, and he was described as a "socially reclusive male who lives with his grandmother since losing his job with INS (special agent) in 2001." (Id.).

Plaintiff underwent detoxification treatment from December 18 to December 22, 2009 at St. Vincent's Medical Center, to which he was referred by the Post Traumatic Stress Center in New Haven. (Tr. 304-21, 429-38); see note 6 supra.

[11]At his hearing before the ALJ, plaintiff's counsel made clear to the ALJ that while plaintiff has complained about pain in his left knee, he has not treated for it and this physical ailment is not the basis upon which he seeks benefits.  (Tr. 39-40).

[12]See note 10 supra.

Plaintiff was seen at Stratford Community Health Center for a follow-up visit on May 20, 2010.  (Tr. 326, 360-61). At the end of May 2010, plaintiff reported to the Post Traumatic Stress Center that he had an "ongoing challenge of surmounting lack of motivation with regard[ ] to ongoing schooling." (Tr. 396).  A week later, he was "concerned about not being able to complete summer courses[.]" (Id.).  On August 3, 2010, plaintiff appeared "sullen [and] downcast[,]" and he reported a lack of concentration and focus with his schooling and he "fear[ed] dropping out of all" of his courses.  (Id.).   Plaintiff was having a "hard time considering himself as disabled though he [was] considering applying" for benefits at that time.  (Id.).  By August 10, 2010, he had dropped his summer courses and felt frustrated and "unable to manage." (Tr. 397).  Ten days later, he was "unfocused." (Id.).  By August 31, 2010, he showed "more initiative in taking charge of his treatment plan." (Id.).

On September 8, 2010, plaintiff was seen at the Hollow Community Health Center, at which time plaintiff was taking Bystolic, Lithium, Seroquel, Celebrex and Abilify.  (Tr. 322-23).  The next day, plaintiff reported to the Post Traumatic Stress Center that he was taking Seroquel, Abilify and Lithium.  (Tr. 398). On September 22, 2010, he complained of decreased energy and reported that he "can't go on like this." (Tr. 399).  He was showering once a week, had difficulty getting out of bed, had a decreased appetite and sleep, and experienced feelings of worthlessness and helplessness.  (Id.).  Six days later, plaintiff reported depressed mood and decreased energy since changing his medication to Seroquel.  (Tr. 400).  On September 30, 2010, plaintiff reported "slight improvement[,]" and two weeks later, he reported improvement in his sleep.  (Tr. 401).   On October 22, 2010, plaintiff "sounded calmer[]" and was feeling "energized." (Id.).   At his appointments on October 27 and November 4, 2010, plaintiff continued to report depressed mood, a lack of motivation and decreased energy. (Tr. 402). On November 16, 2010, plaintiff's difficulties

with concentrating and energy were noted (Tr. 403), and a week later, he reported an improvement in mood and had a "smile on his face."  (Id.).

On December 7, 2010, plaintiff returned to the Bridgeport Community Health Center. (Tr. 359).  On the same day, he was seen at the Post Traumatic Stress Center and his ten pound weight gain over the previous three months was noted.  (Tr. 404). Plaintiff was seen again on December 14, and on December 21, 2010, plaintiff reported suicidal ideation over the weekend which was his one year anniversary of sobriety. (Tr. 405).

On January 13, 2011, plaintiff reported "major improvements in mood and ability to focus" since the increase in Wellbutrin; he reported that he was "no longer feel[ing] that dark depression and more days have been good then bad over the past [three] weeks[.]" (Tr. 406, 417).  Plaintiff was seen at the Stratford Community Health Center on January 18, 2011, at which time depression and bipolar disorder were noted.  (Tr. 358).  Two days later, plaintiff reported improvements in his mood but also noted that he continued to feel decreased energy and continued to feel depressed. (Tr. 407, 418).

On February 10, 2011, plaintiff reported "major improvements in mood[,]" he "endorsed a positive outlook on his life and feeling good[,]" and he reported plans to go to Vermont at the end of the month to spend time with friends and family.  (Tr. 419).  His provider noted that he was showing "significant improvements in mood, affect and his presentation."  (Id.).   He continued to take Wellbutrin and Seroquel.  (Id.).   Six days later, plaintiff reported difficulty sleeping and fear that he was abusing his medication to sleep.  (Tr. 420).  An "overall improvement" in his depression symptoms was noted, and it was noted that he had manic symptoms around the time that he was losing his job in 2003.  (Id.).  His improvement in depressive symptoms continued when he was seen on February 23, 2011 (Tr. 421), and while his sleep had improved at his next appointment a

9

week later, his mood was depressed.  (Tr. 422).  On March 16, 2011, plaintiff continued to exhibit feelings of depression, worthlessness, and low energy, all of which may be "exacerbated by his negative self talk[.]" (Tr. 423). Plaintiff's mood had worsened by his next appointment and he remained depressed.  (Tr. 424).  On April 6, 2011, he continued to endorse a depressed mood, worthlessness, and feelings of being a failure, although he also showed some signs of improvement. (Tr. 425, 475).  A week later, plaintiff's clinician noted that plaintiff was excited and had "energy and passion" in his voice, but he expressed concern that plaintiff was moving to a manic episode. (Tr. 474).   At the end of April, plaintiff was walking his dog daily and his "self-care ha[d] improved."  (Tr. 473).   However, on May 5, 2011, plaintiff had a depressed mood, decreased energy, poor concentration and poor appetite, but he remained motivated to return to school. (Id.).

On June 22, 2011, it was noted that plaintiff appeared to be taking better care of himself, and he enrolled in two courses.  (Tr. 472).  Five days later, his mood was "stable."  (Id.).   A month later, on August 16, 2011, plaintiff reported that he had "self [discontinued]" his medications for a while "and did much worse."  (Tr. 471).

On October 17, 2011, plaintiff was "distressed about his studies, reporting that he skipped a test in class today due to anxiety." (Tr. 468). He was unable to focus, but with the use of Vyvanse to treat attention deficit, plaintiff's cognitive functioning "felt improved[.]" (Id.; see also Tr. 470 (frustration with inability to focus at school)).  One week later, he "endorsed feelings of anxiety and frustration" and displayed agitation.  (Tr. 467). On November 10, 2011, plaintiff exhibited a "brighter mood and affect."  (Tr. 467).

On November 14 and 28, 2011, plaintiff reported his difficulty with schooling and his inability to focus. (Tr. 465-66). Plaintiff was given Adderall which made him "significantly improved in [the

classroom] and [while doing] homework." (Tr. 466).   At the end of December 2011, plaintiff continued to report depressive symptoms "related to being taken advantage of by numerous individuals[.]" (Tr. 464).  His mood was stable and he was anxious and agitated.  (Tr. 465).

In January 2012, plaintiff's anxiety, distraction and trust issues were noted (see Tr. 462-63); on January 27, 2012, plaintiff focused on his mistakes in schooling and discussed his difficulty expressing emotions  (Tr. 461), and three days later, he "endorsed anxiety regarding his decision to enroll in [an] upcoming algebra course[.]" (Id.).  In February 2012, plaintiff reported feelings of failure and increased agitation, along with decreased motivation.  (Tr. 460).

On March 5, 2012, plaintiff reported increased anxiety, and had difficulty expressing anger. (Tr. 459, 484).  A week later, his anxiety was still increased and decreased "ADLs [and] [decreased] attention/concentration" were noted.  (Id.).  At the end of March, plaintiff reported increased anger and frustration, with decreased attention.  (Tr. 485).  Plaintiff returned for four weekly visits in April during which he continued to discuss his feelings of anger and his trust issues, and he continued to appear depressed.  (Tr. 486-87).  On May 7, 2012, plaintiff discussed his difficulty with and tolerance of other people, and during his next two appointments, he discussed his distrust of others and increased self criticism.  (Tr. 488-89; see also Tr. 490).  In June 2012, plaintiff's mood was "stabilized" (Tr. 491), but by July 6, 2012, plaintiff presented with a depressed affect (Tr. 492), then three days later, his mood was "marginally" improved (id.), but on July 16, 2012, the clinician noted that plaintiff's concentration was impaired.  (Tr. 493).  A week later, plaintiff's speech was pressured and he lacked energy (Tr. 494), and in August, his flat affect remained, although by the end of the month it was noted that he was "[d]oing well[.]" (Tr. 495-96).   He continued to fluctuate between a "stabilized mood" and depression with a decreased affect and difficulty concentrating over the next four months.  (Tr. 497-503).

C. MEDICAL OPINIONS

On December 21, 2010, Dr. Hadar Lubin, Kristin Hale, APRN, and Tom Jones, RN, completed a medical source form on behalf of plaintiff in which they noted that they continued to treat plaintiff on a weekly basis since February 9, 2009, during which time they have seen a "[s]light [i]mprovement[.]" (Tr. 354; see Tr. 354-57). Plaintiff's diagnosis was major depressive disorder, recurrent, moderate, for which he was taking Wellbutrin XL and Seroquel XR. (Tr. 354). Plaintiff was referred to their Post Traumatic Stress Clinic in February 2009 and his attendance was "sporadic" until he detoxed in 2009, and since that time, his attendance has been consistent. (Id.).[13] He was diagnosed with depressed mood, difficulty concentrating, poor appetite, and feelings of helplessness and worthlessness. (Id.). He was alert and oriented, with an intact memory, and limited concentration and attention. (Id.). At times his speech was "circumstantial and slow to respond[,]" his mood was depressed with a constricted affect, and his judgment and insight were fair. (Tr. 355). As of that time, his treating providers opined that plaintiff has "[a] [v]ery [s]erious [p]roblem" taking care of his personal hygiene, caring for physical needs, using appropriate coping skills to met ordinary demands of a work environment, interacting appropriately with others in a work environment, focusing long enough to finish assigned simple tasks or activities, changing from one simple task to another, performing basic work activities at a reasonable pace, and performing work on a sustained basis. (Tr. 355-56). Additionally, he has "[a] [s]erious [p]roblem" asking questions or requesting assistance, respecting or responding appropriately to others in authority, and carrying out multi-step instructions (id.), and he has "[a]n [o]bvious problem" handling frustration appropriately and carrying out single-step instructions.

---

[13]On May 9, 2011, Jones and Hale noted that, "[t]o our knowledge alcohol has not been a material contributing factor in regards to [plaintiff's] diagnosis of Major Depression. [Plaintiff] has been adherent with treatment at this clinic and compliant with prescribed medications." (Tr. 427).

(Id.). Plaintiff also has a "[s]light problem" using good judgment regarding safety and dangerous circumstances, and getting along with others without distracting them.  (Id.).

On January 11, 2011, Jerrold Goodman, Ph.D., completed a Residual Functional Capacity Assessment of plaintiff for SSA in which he concluded that plaintiff has limitations in his ability to have sustained concentration and persistence, he is moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 80-82, 91-93). Additionally, plaintiff is moderately limited in his ability to interact appropriately with the general public and has adaptation limitations, specifically such that plaintiff is moderately limited in his ability to set realistic goals or make plans independently of others. (Tr. 81).  According to Dr. Goodman, plaintiff can perform simple, routine tasks and can make simple work-related decisions, and he would occasionally have difficulty sustaining concentration sufficient to perform more complex tasks and to complete a normal workweek.  (Tr. 80-82, 91-93).  Additionally, Dr. Goodman opined that plaintiff's social skills are intact, but he is "somewhat isolated socially[,]" which would "make him uncomfortable interacting with the general public[,]" and he "would benefit from assistance in setting realistic goals given his history of poor judgment."  (Tr. 81-82, 92-93).

On February 8, 2011, Dr. Abraham Bernstein completed a Residual Functional Capacity assessment of plaintiff for SSA (Tr. 91-95) in which, like Dr. Goodman, he concluded that plaintiff is moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek, to interact appropriately with the general public, and to set realistic goals or make plans independently of others.  (Tr. 91-93).

13

On March 30, 2011, Kristin Hale completed another Medical Source Statement on behalf of plaintiff (Tr. 409-13), in which she opined that plaintiff has appetite disturbance with weight change, sleep disturbance, mood disturbance, anhedonia or pervasive loss of interests, feelings of guilt/worthlessness, difficulty thinking or concentrating, and decreased energy.  (Tr. 409).  She noted that he has been diagnosed with major depression and has self-care deficits, anhedonia, difficulty sleeping without psychotropic medication, and "has a persistently depressed mood that limits him from engaging in work-related activities."  (Tr. 410).  According to Hale, plaintiff's impairments would cause him to be absent from work about three times a month, and he has a "[c]omplete loss of ability . . .; [he] can not sustain performance during an [eight]-hour workday." (Id.).  In her opinion, his ability to understand, remember and carry out instructions is affected, and he has an extreme loss in his ability to maintain concentration, maintain regular attendance and concentration, deal with the stress of semi-skilled and skilled work, and adhere to basic standards of neatness and cleanliness.  (Tr. 410-12).  In her opinion, plaintiff has a marked loss in his ability to complete a normal workday or workweek without interruptions from psychologically- based symptoms,  perform at a consistent pace without an unreasonable number and lengths of rest periods, get along with coworkers and peers, and set realistic goals or make plans independently of others.  (Tr. 411-12).   She also opined that plaintiff has a moderate loss in his ability to sustain an ordinary routine without special supervision, work in coordination with or proximity to others, make simple work-related decisions, ask simple questions, maintain socially appropriate behavior, respond appropriately to changes in a routine work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places. (Id.).  Hale opined that plaintiff has a marked restriction in his activities of daily living and in maintaining social functioning, has frequent deficiencies in concentration, persistence or pace, and has one or two episodes of deterioration or

decompensation.  (Tr. 412).

On April 6, 2011, Dr. Thomas Hill completed a mental residual functional capacity assessment of plaintiff in which he concluded, exactly as Dr. Goodman had, that plaintiff has limitations in his ability to have sustained concentration and persistence, he is moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, and to set realistic goals or make plans independently of others.  (Tr. 103-05).  Dr. Hill's narrative was verbatim the same narrative as Dr. Goodman: plaintiff can perform simple, routine tasks and can make simple work-related decisions, and he would occasionally have difficulty sustaining concentration sufficient to perform more complex tasks and to complete a normal workweek.  (Tr. 104).  Additionally, exactly as stated by Dr. Goodman, Dr. Hill opined that plaintiff's social skills are intact, but he is "somewhat isolated socially[,]" which would "make him uncomfortable interacting with the general public[,]" and he would "benefit from assistance in setting realistic goals given his history of poor judgment."  (Tr. 104-05).

On April 7, 2011, Dr. Lubin, Hale and Jones completed another medical source statement on behalf of plaintiff in which plaintiff's major depressive disorder was noted.  (Tr. 414; see Tr. 414-16, 426).  The providers noted that plaintiff's memory is intact, his attention and concentration are limited, and he requires frequent redirection in therapy sessions.  (Tr. 414).  Plaintiff's speech is "circumstantial [at] times[,]" his mood is depressed with a constricted affect, and his judgment and insight are limited.  (Tr. 415).  The providers noted plaintiff's obsessive compulsive behaviors with examining and collecting flashlights, and he has "self-care deficits [with] bathing regularly and

preparing meals for himself on a daily basis." (Id.).   Just as they concluded in December 2010, plaintiff has "[a] [v]ery [s]erious [p]roblem" taking care of his personal hygiene, caring for physical needs, using appropriate coping skills to met ordinary demands of a work environment, focusing long enough to finish assigned simple tasks or activities, performing basic work activities at a reasonable pace, and performing work on a sustained basis. (Tr. 415-16). Additionally, he has "[a] [s]erious [p]roblem" asking questions or requesting assistance, carrying out multi-step instructions, and changing from one simple task to another (Tr. 416), and he has "[a]n [o]bvious problem" handling frustration appropriately, getting along with others without distracting them, and carrying out single-step instructions. (Tr. 415-16). Plaintiff also has a "[s]light problem" interacting appropriately with others in a work environment, respecting or responding appropriately to others in authority, and using good judgment regarding safety and dangerous circumstances.  (Id.). According to his providers, plaintiff is "unable to keep his focus and attention on tasks at home to complete them in a timely manner or at all almost daily." (Tr. 416).

Dr. Lubin completed another Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairments on December 19, 2011. (Tr. 444-48, 452-57). Dr. Lubin noted plaintiff's attention deficit disorder and she opined that plaintiff has poor memory, sleep disturbance, mood disturbance, emotional lability, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feeling of guilt/worthlessness, difficulty thinking or concentrating, oddities of thought, perception, speech or behavior, time or place disorientation, social withdrawal or isolation, illogical thinking or loosening of associations, decreased energy, obsessions or compulsions, and generalized persistent anxiety. (Tr. 444, 452). According to Dr. Lubin, plaintiff is "depressed and [is] disrupted in his ability to focus" which would cause him to be absent more than three times a month. (Tr. 445).  His ability to understand, remember and carry out instructions

is affected, as is his ability to respond appropriately to supervision, coworkers and work pressure in a work setting. (Tr. 445-46, 453-54). Dr. Lubin opined that plaintiff has an extreme loss in his ability to remember locations and work-like procedures, understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or work week without interruptions from psychologically-based symptoms, perform at a consistent pace, get along with coworkers and peers without unduly distracting them, adhere to basic standards of neatness and cleanliness, respond appropriately to changes in a routine work setting, and set realistic goals or make independent plans. (Tr. 446-47, 454-55). Additionally, plaintiff has a marked loss in his ability to understand, remember and carry out very short, simple instructions, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, deal with the stress of semi-skilled and skilled work, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, be aware of normal hazards, travel in unfamiliar places, and use public transportation. (Id.). Plaintiff also has a moderate loss in his ability to interact appropriately with the public and ask simple questions or request assistance. (Tr. 447, 455-56). Additionally, Dr. Lubin opined that plaintiff has marked restrictions in his activities of daily living, extreme difficulties maintaining social functioning, constant deficiencies in concentration, persistence or pace, and repeated episodes of deterioration. (Id.). According to Dr. Lubin, plaintiff's impairments would cause him to be absent more than three times a month. (Tr. 445, 453).

In addition to the foregoing, Dr. Lubin and Hale completed two more evaluations subsequent to the hearing before the ALJ, both of which were presented to the Appeals Council.

(Tr. 479-82, 508-11).  In a Mental Residual Functional Capacity Statement completed on May 3, 2012, Dr. Lubin and Hale noted that plaintiff was taking Seroquel and Vyvanse, and that plaintiff experienced memory lapses, educational limitations, weight fluctuation, physical agitation, rapid or pressured speech, and an inability to focus, concentrate or stay on task. (Tr. 479, 481-82).  In their opinion, the following limitations "[p]reclude[ ] performance for 15% or more of an [eight]-hour work day": plaintiff's ability to understand and remember very short and simple or detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods of time, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, to accept instructions and respond appropriately to criticism, to get along with coworkers and peers without distracting them, to maintain socially appropriate behavior, and to respond appropriately to changes in the work setting, and set realistic goals.  (Tr. 479-81). Additionally, the following limitations "[p]reclude[ ] performance for  10% of an [eight]-hour work day": plaintiff's ability to remember locations and work-like procedures, to carry out very short and simple instructions, to perform activities within a schedule, to interact appropriately with the general public, to ask simple questions or request assistance, to be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places or use public transportation.  (Id.). According to plaintiff's medical providers, he would be "off task" "[m]ore than 30%" of the work day; he would be absent four days per month; he would be unable to complete an eight hour work day five or more days a month; and he would be able to perform work on a sustained basis less than 50% of the time. (Tr. 481).  Plaintiff was assigned a GAF of 50, with the highest GAF of the

18

past year at 55.  (Tr. 482).[14]  His medical providers noted that plaintiff "has a tremendous amount

of difficulty maintaining focus[,]" he often experiences "major mental blockage and [he] struggles

. . . interpersonally[.]" (Id.).  Additionally, he is "socially isolated and demonstrates a lack of insight

into root causes and current problematic behaviors."  (Id.).

  As of December 12, 2012, Hale and Dr. Lubin rated plaintiff more severely limited, finding

him precluded from performance for 15% or more of an eight-hour work day in every category

except in his ability to understand, remember and carry out very short and simple instructions, and

in his ability to ask simple questions or request assistance, for which abilities plaintiff would be

precluded for 10% of the work day.  (Tr. 508-11).  As of December 2012, plaintiff was taking

Seroquel, Vyvanase, and Buproprion (Tr. 508), and he had memory lapses, educational limitations,

would need to avoid noise, had mood dysregulation, and was hypersensitive to others.  (Tr. 510).

Just as in May, his medical providers opined that plaintiff would "off task" "[m]ore than 30%" of

the work day; he would be unable to complete an eight hour work day five or more days a month;

he would be able to perform work on a sustained basis less than 50% of the time; and he would

be absent five days in a month, which was one more day than anticipated in their May assessment.

(Tr. 510).  Plaintiff's treating providers noted that plaintiff has attention deficit, hyperactivity, and

he is on the highest dose of medication.  (Tr. 511).  Plaintiff's "mood varies rapidly, depending on

[the] setting," he has "chronic depression and social isolation, poor judgment in social settings[,]

---

[14]The Global Assessment of Functioning, or GAF score, is a numeric scale used by mental health
providers to subjectively rate the social, occupational, and psychological functioning of adults. A GAF
score of 51 to 60 indicates moderate symptoms, e.g., flat affect and circumstantial speech, or moderate
difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental
Disorders, 4th Ed. at 34 (4th Ed. 2000).  A GAF score of 50 indicates serious impairment in social,
occupational, or school functioning.  Id.

[and][p]oor cognitive abilities as per [his] recent failure in remedial math."  (Id.).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)(quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id.  Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to

disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment.  See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. §§  404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.   See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. §§  404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using

21

guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996), citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986).

## IV.  DISCUSSION

Following the five step evaluation process ALJ Tracy found that plaintiff has not engaged in substantial gainful activity since January 1, 2010, his amended onset date of disability. (Tr. 14).  ALJ Tracy then concluded that plaintiff has the following severe impairments: depression and polysubstance abuse in remission, but he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 14-15).  ALJ Tracy found that plaintiff has the RFC to perform the full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine, repetitive tasks and make simple work-related decisions, and he cannot interact with the public.  (Tr. 15-19). The ALJ concluded that plaintiff is unable to perform

any past relevant work as an investigator and boat cleaner, but considering his age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform, such as a hand packager, cleaner, assembler, and inspector in the electronics industry. (Tr. 20-21).  Accordingly, the ALJ concluded that plaintiff has not been under a disability from January 1, 2010, through the date of her decision.  (Tr. 21).

Plaintiff moves for an order reversing or remanding this case to the Commissioner on grounds that the ALJ failed to apply the treating source rule (Dkt. #11, Brief at 17-23); the ALJ improperly evaluated plaintiff's mental impairments (id. at 23-30); the ALJ's credibility determination is fatally flawed (id. at 31-35); and the ALJ's functional capacity assessment is flawed (id. at 35-38).

In response, defendant asserts that the ALJ's mental RFC determination is supported by substantial evidence and comports with all relevant law (Dkt. #13, Brief at 4-7); the ALJ followed the treating physician rule (id. at 7-9); the ALJ properly considered plaintiff's mental impairments (id. at 9-13); the ALJ's evaluation of plaintiff's credibility is supported by substantial evidence and comports with relevant law (id. at 14-16); and the ALJ's step five finding that plaintiff can perform work existing in significant numbers in the national economy is supported by substantial evidence and is legally proper (id. at 16-18).

A. TREATING PHYSICIAN RULE

In her decision, the ALJ affords little weight to Dr. Lubin's assessment of plaintiff's residual functional capacity on grounds that her "opinions are not consistent with the objective medical evidence or the treatment record[,]" her findings are "not supported by the claimant's essentially normal mental status examinations[,]" the finding of extreme difficulties is "patently inconsistent with Dr. Lubin's own assessment of a GAF of 55[,]" and plaintiff's treatment notes do "not support

a finding of essentially incapacitating depression." (Tr. 18). The ALJ similarly afforded little weight to the opinion of the APRN Hale on the same grounds assigned to Dr. Lubin, along with the ALJ's observation that Hale completed her opinion in March 2011, and therefore, it does "not reflect the claimant's recent treatment or motivation to return to school." (Id.).

The ALJ rejects the foregoing treating source opinions in favor of the opinions of the non-examining State agency sources, Jerrold Goodman, Ph.D., and Dr. Thomas Hill, to which the ALJ assigned "partial weight." (Tr. 19). The ALJ relies on Dr. Goodman and Dr. Hill's opinion that plaintiff can perform simple, routine tasks, can make simple work-related decisions, and would be "uncomfortable interacting with the general public despite intact social skills." (Id.).

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008), quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted)). The treating physician rule provides that "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(citations omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[T]he opinion of the treating physician is not afforded controlling weight[,]" however, where "the treating physician issued opinions that are not consistent with other substantial evidence in the record[.]" Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

The ALJ must consider all of the following factors in deciding the weight assigned to any medical opinion:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security

Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32, citing former 20 C.F.R. § 404.1527(d)(2), now § 404.1527(c)(2).   "After considering the above factors, the ALJ must 'comprehensively set forth her reasons for the weight assigned to a treating physician's opinion.'" Burgess,  537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2)(stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.")(emphasis added). The treating physician's opinion is assigned greater weight because of the "continuity of treatment . . . provide[d]" and because  "the doctor/patient relationship [the treating source] develops place[s] [the treating source] in a unique position to make a complete and accurate diagnosis of his[/her] patient." Mongeur v. Heckler, 722 F.2d 1033, 1039, n.2 (2d Cir. 1983)(citations omitted).  This is "especially the case with respect to mental health issues because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the claimant." Bethea v. Astrue, 3:10 CV 744 (JCH), 2011 WL 977062, at *11 (D. Conn. Mar. 17, 2011)(internal quotations & citations omitted).

In this case, Dr. Lubin and her staff[15] consistently treated plaintiff on a weekly basis from February 2009, a month after plaintiff's alleged onset date. (See Tr. 354).  This regular contact allowed for the development of a close treatment relationship which is reflected in the contemporaneous treatment notes in the administrative record.  See Halloran, 362 F.3d at 32.  Yet, in spite of the consistency and longevity of treatment from plaintiff's treating sources, the ALJ assigned little weight to their opinions on the following grounds:

> Dr. Lubin's opinions are not consistent with the objective medical evidence or the
> treatment record.  First, [her] finding of marked, extreme cognitive, social and
> intellectual difficulties is not supported by the claimant's essentially normal mental

---

[15]The ALJ rejected Dr. Lubin and Hale's opinions on the same grounds; thus, Hale's evaluation will not be addressed separately.

status examinations.   Furthermore, the findings of such extreme difficulties is patently inconsistent with Dr. Lubin's own assessment of a GAF of 55 . . . , suggesting only moderate difficulties in functioning.   Finally, the claimant's treatment notes − including the evidence describing improvement with treatment − do not support a finding of essentially incapacitating depression.   Therefore, Dr. Lubin's opinion is entitled to little weight.

(Tr. 18)(internal citations omitted).

As an initial matter, the ALJ erred in relying on the GAF score as an indicative of the severity of plaintiff's mental impairment. "The GAF score is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262, n.1 (2d Cir. 2008), quoting DSM-IV, at 32. A GAF score "does not have a direct correlation to the severity requirements in [the SSA's] disorders listing." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injuries, 65 Fed. Reg. 50746, 50764-5 (Aug. 21, 2000); see also Scheu v. Astrue, No. 2:08-00081, 2010 WL 711813, at *5 (M.D. Tenn. Feb. 23, 2010)(citations omitted)("Notably, the mental disorder Listings [including Listing 12.04] do not reference GAF scores.   Thus, an individual's GAF does not determine whether the requisite level of severity has been met for the purposes of Social Security disability."). The ALJ must consider the entire record before reaching her conclusion.

While defendant contends that the ALJ did not err in concluding that Dr. Lubin's opinions "were inconsistent with other substantial evidence in the record[,]" in her brief, defendant only refers to the "opinions of the state agency reviewing psychologists" as the "other substantial evidence in the record[.]" (Dkt. #13, Brief at 8).   "[T]he opinions of nonexamining sources [may] override treating sources' opinions, provided they are supported by evidence in the records." Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993)(citations omitted); see Guarini v. Astrue, Civ. No. 3:11 CV 1609 (TPS), 2013 WL 1087631, at *4-5 (D. Conn. Feb. 19, 2013)(remand so that non-examining source can review all evidence of record), Recommended Ruling adopted over objection,

2013 WL 1087629 (D. Conn. Mar. 14, 2013).

In this case, Drs. Goodman and Hill, the non-examining sources upon whose opinions the ALJ relied, assessed plaintiff in January and April 2011, respectively. (Tr. 80-82, 92-93, 103-05). One medical source statement had been completed by Dr. Lubin, Hale and Jones prior to Dr. Goodman's opinion, and one additional treating source statement was completed prior to Dr. Hill's assessment, which assessment was identical in all respects to that of Dr. Goodman; an additional four more medical source statements would be completed by plaintiff's treating providers subsequent to the non-examining agency providers' opinions. (See Tr. 354-57, 409-16, 426, 444-48, 479-82, 508-11). This case is remarkable for the number of treating source opinions before the ALJ, all of which are consistent, and all of which detail greater limitations than those assessed by the non-examining sources. These opinions are supported by extensive, regular treatment notes from the Post Traumatic Stress Clinic, which do reflect some improvement at times in plaintiff's condition (see Tr. 401, 406-07, 417-19, 421, 472-73),[16] but which records also reflect that plaintiff consistently lacked focus and concentration (see Tr. 396-97, 459, 465-66, 473, 484, 493), lacked the ability to shower regularly (Tr. 399), experienced weight fluctuation (Tr. 404), lacked motivation and had decreased energy (Tr. 399, 407, 418, 423, 460, 473), had a depressed mood (Tr. 418, 422, 424-25, 464, 475, 486-87, 492; see generally Tr. 496-503), and had feelings of worthlessness (Tr. 399, 423, 425). His treating providers, who he saw regularly over a period of several years from a year prior to his onset date forward, are in the best position to assess his mental status, and they did so in no less than six assessments for SSA. See Bethea, 2011 WL 977062, at *11 (internal quotations & citations omitted)(emphasizing the importance of examining providers' opinions "especially with respect to mental health issues because the inherent subjectivity of a psychiatric

---

[16]When plaintiff's mood improved to the extent that he was excited and had energy and passion in his voice, his clinician expressed concern that plaintiff was moving to a manic episode. (Tr. 474).

diagnosis requires the physician rendering the diagnosis to personally observe the claimant.").  In these reflective assessments, plaintiff's treating providers consistently noted plaintiff's depressed mood, difficulty concentrating, poor appetite, and feelings of worthlessness and helplessness (Tr. 354 (December 2010), 409-10 (March 2011), 414-15 (April 2011), 444 (December 2011), 479, 481 (May 2012), 510-11 (December 2012)).  They consistently opined based on their interaction, and as reflected in their treatment records, that plaintiff has "[a] [v]ery [s]erious [p]roblem" with personal hygiene,  has "self-care deficits[,]" and has an "extreme loss" in his ability to adhere to basic standards of neatness and cleanliness on a daily basis (Tr. 355 (December 2010), 410, 412 (March 2011), 415 (April 2011)), and he has "[a] [v]ery [s]erious [p]roblem[,]" an "[o]bvious [p]roblem[,]" or is moderately impaired in his ability to interact appropriately with others and maintain socially appropriate behavior (Tr. 355 (December 2010), 411-12 (March 2011), 415 (April 2011), 447, 455-56 (December 2011), 479-81 (May 2012)).  Additionally, plaintiff's providers consistently opined that plaintiff's impairments would cause him to be absent from work more than three times a month (Tr. 410 (March 2011), 453 (December 2011)), four times a month (Tr. 481 (May 2012), or as many as five times a month (Tr. 510 (December 2012)).  In light of the extensive consistent treatment records and the half dozen treating source statements, the ALJ did not properly apply the treating physician rule when she assigned little weight to the treating source opinions in favor of the duplicative non-examining sources' opinions that lack support in the record.

Additionally, while the ALJ emphasizes the fact that plaintiff went back to school, and discounts Hale's March 2011 opinion because it pre-dated "the claimant's recent treatment or motivation to return to school[,]" the ALJ erroneously does so at the exclusion of all of the evidence of record revealing that plaintiff felt overwhelmed by his decision to enroll in classes, and ultimately, withdrew from all of his courses because he could not handle school.  (See Tr. 396-97 (plaintiff reported an "ongoing challenge of surmounting lack of motivation with regard[ ] to ongoing

school[,]" he was "concerned about not being able to complete summer courses[,]" he reported a

lack of concentration and focus with his schooling and "feared dropping out of all" of his courses[,]

and ultimately, he did drop all of his summer courses because he was "unable to manage"), Tr. 468

(plaintiff was "distressed about his studies, reporting that he skipped a test in class today due to

anxiety"), Tr. 461 (plaintiff focused on mistakes in schooling), Tr. 461 ("endorsed anxiety regarding

his decision to enroll in upcoming algebra course")).  The ALJ neglects to mention any of this in her

decision, but rather, to the contrary, the ALJ notes in her decision that "claimant's interest in

returning to school and pursuing a maritime career are relevant to this case[]" as this decision

"demonstrates the claimant's capacity to plan activities, maintain a schedule, and attempt college-

level coursework." (Tr. 18).  As plaintiff appropriately observes, the ALJ "missed the relevant point:

The plaintiff abjectly failed in every academic effort he made since his January 1, 2010 Onset Date[

]" as he "repeatedly signed up for courses and ended up failing them or withdrawing."  (Dkt. #11,

Brief at 23)(emphasis in original & footnote omitted).[17]  Thus, the ALJ's erred in rejecting the

treating source's opinion on grounds that it pre-dated plaintiff's "motivation to return to school[,]"

as the ALJ's treatment of plaintiff's attempt at schooling was not based on substantial evidence of

the record relating thereto. (Tr. 18).


## B.  OTHER ARGUMENTS

In light of this conclusion regarding the ALJ's failure to properly apply the treating physician

rule, the Court need not address plaintiff's claims regarding the ALJ's improper evaluation of

---

[17]Defendant counters plaintiff's argument by stating that "an ALJ is simply not required to recite each piece of evidence[.]" (Dkt. #13, Brief at 7)(citation omitted).  While defendant is correct that the ALJ "does not have to state on the record every reason justifying a decision[,]" Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012)(per curiam), the ALJ must consider such evidence.  Id.  In this case, there is no evidence in the ALJ's decision that the ALJ considered the fact that plaintiff withdrew or failed all of his courses because he was overwhelmed by his decision to enroll in classes and could not "manage" to complete such casework.

plaintiff's mental impairments, regarding the ALJ's functional capacity assessment, and regarding the ALJ's credibility assessment, as, on remand, further consideration and proper application of the treating physician rule may alter the ALJ's subsequent findings relating to plaintiff's mental impairments, RFC and credibility.

V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #11) is granted such that the case is remanded for further proceedings consistent with this Recommended Ruling, and defendant's Motion to Affirm (Dkt. #13) is denied.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 9th day of December, 2013.


 /s/ Joan G. Margolis, USMJ   
Joan Glazer Margolis
United States Magistrate Judge